IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

Criminal No. ELH-15-0261

ALEKSEY SOSONKO, *et al.*

*Defendants*.

**MEMORANDUM OPINION**

Defendant Aleksey Sosonko, who is self-represented, has filed a "Motion for the Reduction of Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i)."  ECF 557 ("Motion").  He pleaded guilty on December 17, 2015, to charges of conspiracy to affect interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (Count One); kidnapping, in violation of 18 U.S.C. § 1201(a) (Count Four); and using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Six).  ECF 153.  The firearm offense has since been vacated.  Sosonko is serving a sentence of 160 months of incarceration.  ECF 416 ("Amended Judgment") at 2.

According to the facts stipulated in the Plea Agreement (ECF 154), defendant participated in an armed home invasion robbery in Reisterstown, Maryland on July 22, 2012. *Id.* at 11.  Several months later, using firearms obtained during the robbery, defendant and several coconspirators kidnapped the son of the owner of Antony Jewelers, a store in Owings Mills, Maryland.  Defendant and his coconspirators then robbed the jewelry store of more than half a million dollars of inventory.

The Motion is supported by numerous exhibits.  *See* ECF 557-2 to ECF 557-18.  Defendant has also filed a "Supplement to the Defendant's Motion Seeking Compassionate Release."  ECF 576 ("Supplement").  The government opposes the Motion.  ECF 574 ("Opposition").  The

Opposition is supported by eleven exhibits.  ECF 574-1 to ECF 574-11.  Defendant has replied.
ECF 588 ("Reply").  The Reply is supported by fourteen pages of exhibits.  *See* ECF 588-2.

No hearing is necessary to decide the Motion.  *See* Local Rule 105.6.  For the reasons that
follow, I shall deny the Motion.

## I.  Background

In a six-count Superseding Indictment returned on July 28, 2015 (ECF 77), a Grand Jury
in the District of Maryland charged defendant and several coconspirators with conspiracy to affect
interstate commerce by robbery, in violation of 18 U.S.C. § 1951 (Count One); affecting interstate
commerce by robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to commit
kidnapping, in violation of 18 U.S.C. § 1201(c) (Count Three); kidnapping, in violation of 18
U.S.C. § 1201(a) (Count Four); carjacking, in violation of 18 U.S.C. § 2119(1) (Count Five); and
use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §
924(c)(1)(A) (Count Six).[1]

As noted, on December 17, 2015, Sosonko pleaded guilty to Count One, Count Four, and
Count Six of the Superseding Indictment.  ECF 153.  The plea was tendered pursuant to a Plea
Agreement.  ECF 154; *see also* ECF 155.  The government agreed to dismiss the remaining counts
at the time of sentencing.  ECF 154, ¶ 14.  In the Plea Agreement, the parties stipulated to facts
establishing that defendant "participated in the planning and commission of [an] armed robbery of
Antony Jewelers," located in Owings Mills.  *Id.* at 11.  In addition, the stipulated facts established
that "Sosonko participated in an armed home invasion robbery designed to obtain firearms" that
"were subsequently used in the robbery of the jewelry store."  *Id.*

---

[1] The other defendants charged in Counts One through Five were Stanislav Yelizarov, Igor
Yasinov, Grigory Zilberman, Peter Magnis, Marat Yelizarov, and Sorhib Omanov.  *See* ECF 77.
With the exception of Omanov, all defendants were charged in Count Six.  *See id.*

According to the stipulated facts, during the summer of 2012, defendant Grigory Zilberman was, on several occasions, an invited guest of Z.R. at Z.R.'s home in Reisterstown. *Id.* Zilberman knew "that the residents of the home owned numerous firearms for sporting purposes." *Id.* "In the days leading up to July 22, 2012, Sosonko," Zilberman, and others "conducted surveillance at the residence." *Id.*

"On July 22, 2012, at approximately 2:30 a.m., Sosonko" and his coconspirators traveled "in a single vehicle to Z.R.'s residence . . . ." *Id.* Sosonko and three others were "dressed in all black, wearing ski masks and latex gloves." *Id.* They "entered the home through the unlocked garage door." *Id.* One of Sosonko's coconspirators "was armed with a handgun when they entered the residence." *Id.* "Shortly after entering the residence," Sosonko and two others "grabbed long guns and carried them throughout the home." *Id.*

R.D. was asleep when "four men entered his bedroom . . . pointed guns at him . . .shined flashlights in his eyes," and "order[ed] him not to resist." *Id.* "When R.D. resisted, one of the coconspirators struck R.D. repeatedly with the handgun while another jumped on top of R.D. and began to tie him with a belt and cord." *Id.* "R.D. was told that they would 'put one in him' if he continued to resist." *Id.* And, he "was forced to lay face down while bound." *Id.*

For "approximately one hour," Sosonko and three coconspirators "ransacked the home looking for firearms and other valuables." *Id.* About fifteen minutes after Sosonko and the coconspirators left the residence, R.D. freed himself and called 911. *Id.* When emergency personnel arrived, R.D. was bleeding from the mouth and the back of his head. *Id.* He was transported by ambulance to a hospital. *Id.*

"Items stolen from the house included [ten] long guns (rifles and shotguns), a crossbow, a laptop computer, jewelry and a marijuana smoking device." *Id.* "Numerous electronic devices

including computers and televisions were destroyed during the robbery." *Id.*  The stolen items were valued at approximately $10,000.  *Id.*

According to the stipulated facts, Antony Jewelers "was a retail business that sold, repaired and designed high-end jewelry and watches . . . ."  *Id.* at 12.  In the fall of 2012, Zilberman and Stanislav Yelizarov[2] "devised a plan to commit an armed robbery of Antony Jewelers . . . ."  *Id.*  S. Yelizarov recruited Sosonko and others to participate in the robbery.  *Id.*  While planning the robbery, "Zilberman exploited [a] friendship" with A.V., the son of the owner of Antony Jewelers, *see* ECF 571 at 4, who was also an employee of the business, "for the purpose of learning information about Antony Jewelers . . . ."  ECF 154 at 12.  At the time, A.V. was only 19 years old.  ECF 214 at 4.

The conspirators placed a global positioning device on A.V.'s car "to learn" his "travel routine and habits."  ECF 154 at 12.  "As part of the planning," S. Yelizarov "obtained a law enforcement-type light bar and a loudspeaker to impersonate a police officer to stop [A.V.'s] vehicle."  *Id.*

On January 15, 2013, Zilberman enticed A.V. "to visit his home . . . ."  *Id.*  While A.V. was at Zilberman's residence, Sosonko, Stanislav Yelizarov, and other coconspirators "met at [Stanislav] Yelizarov's residence to prepare for the crime."  *Id.*  Marat Yelizarov and another coconspirator "drove in a single rented vehicle to Zilberman's residence in order to alert the other coconspirators of [A.V.'s] departure and to follow" A.V.  *Id.*

"In the early morning hours of January 16, 2013," M. Yelizarov alerted "the other coconspirators that [A.V.] had left Zilberman's residence."  *Id.*  Thereafter, S. Yelizarov drove

---

[2] To distinguish the brothers Marat and Stanislav Yelizarov, I shall use their first names or the initials of their first name.

4

Sosonko and two others "in a second rented vehicle to intercept [A.V.] on his drive home." *Id.* "They took the following items with them: guns, masks, gloves, the law enforcement-type light bar, the loudspeaker, phones, zip ties, and a bag to cover the victim's head." *Id.* Sosonko and his coconspirators used the light bar "to stop [A.V.'s] car near his home in Owings Mills . . . ." *Id.* "The conspirators used the loudspeaker to command that [A.V.] exit his car." *Id.*

Sosonko and his coconspirators "were each armed with firearms and brandished the firearms to remove [A.V.] from his car." *Id.* A "bag was placed over the victim's head, and he was forcibly bound, and placed into the trunk of his own car." *Id.* The conspirators drove the victim "to a predetermined remote location." *Id.* There, Sosonko and his coconspirators "continued to brandish firearms at" A.V. *Id.* The conspirators told A.V. that they "knew his family's place of residence," and they threatened that if A.V. "did not comply with their demands or if he reported the incident to the police[,] they would kill his family." *Id.* at 13.

At approximately 3:52 a.m., Stanislav Yelizarov and Sosonko "drove in [A.V.'s] car from the remote location to Antony Jewelers . . . ." *Id.* Two other coconspirators "stayed with [A.V.] and held him bound and blindfolded at gunpoint." *Id.* Then, at about 4:19 a.m., Stanislav Yelizarov and Sosonko "entered Antony Jewelers and stole jewelry, stones, and watches valued at over $500,000." *Id.* When Stanislav Yelizarov and Sosonko "were unable to get into [a] locked safe," Stanislav Yelizarov spoke to A.V. on a mobile phone and "threatened additional harm if [A.V.] did not provide the combination to the safe." *Id.* However, A.V. "was unable to provide the combination." *Id.*

S. Yelizarov and Sosonko then returned to the location where A.V. was held. *Id.* Thereafter, A.V. "was placed back into the trunk of his car and driven to another location, where

he was left." *Id.*  Eventually, A.V. "was able to kick his way out of the trunk through the back seat of his car." *Id.*

On January 18, 2013, Stanislav Yelizarov "sold a portion of the stolen jewelry for approximately $29,000 to an . . . informant" for the Federal Bureau of Investigation. *Id.*  Stanislav Yelizarov later traveled to Brooklyn, New York, to sell some of the stolen jewelry and stones. *Id.*  In New York, he "received over $100,000 in cash for the sale of the jewelry and stones." *Id.*  Stanislav Yelizarov returned to Maryland on or about January 21, 2013. *Id.*  He then "divided the cash proceeds among the members of the conspiracy and others." *Id.*  "Sosonko received at least $60,000 from [Stanislav] Yelizarov for his role in the crimes." *Id.*

"Through the incident, the conspirators, including Sosonko, communicated with each other in furtherance of the offenses using mobile phones" that were instrumentalities of interstate commerce. *Id.*

The Plea Agreement also addressed the application of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  The parties agreed that defendant had an offense level of 33 for Counts One and Four.  ECF 154, ¶¶ 9, 10, 11.  Further, the parties agreed that, "[u]nder U.S.S.G. § 2K2.4(b) and 18 U.S.C. § 924(c)(ii), the guideline sentence" with respect to Count Six, the brandishing offense, is seven years, consecutive to any sentences imposed for Count One and Count Four. *Id.* ¶ 9(q).  That corresponded to the mandatory minimum sentence required for Count Six. *Id.* ¶ 5(c).  The government agreed to "recommend a reasonable sentence taking into consideration the adjusted U.S.S.G. level and the sentencing factors outlined at 18 U.S.C. § 3553(a)." *Id.* ¶ 14.

A Presentence Report was prepared.  ECF 166 ("PSR").  It indicated that Sosonko was born in Mogilev, Belarus, in 1980. *Id.* at 2; *id.* ¶ 63.  He immigrated to Baltimore with his family

6

when he was fourteen years of age. *Id.* ¶ 65. Sosonko is a lawful permanent resident. *Id.* Nevertheless, the PSR noted that Sosonko, who has been in custody since May 20, 2015, *id.* at 1, "is pending deportation to his native Belarus once he satisfies his custodial sanction." *Id.* at 17; *see id.* ¶ 65.

With regard to the calculation of Sosonko's offense level, Counts One and Four were grouped as "Group 1." *Id.* ¶ 27. The PSR explained, *id.* ¶ 25:

> Pursuant to USSG § 3D1.2(b), Count 1 and Count 4 are grouped together into a single group. Pursuant to USSG § 3D1.3, in the case of counts grouped under USSG § 3D1.2(a)-(c), the offense level applicable to a group is the offense level determined according to Chapter Two and Parts A, B, and C of Chapter Three for the most serious of the counts comprising the group, i.e., the highest offense level of the counts in the group. The guideline for Count 4 produces the highest offense level.

The "Home Invasion Robbery of July 22, 2012" was designated "Relevant Conduct." *Id.* ¶¶ 34–43. It was the sole offense assigned to Group 2. *See id.*

Count Six did not group. The PSR noted, *id.* ¶ 26: "Pursuant to USSG § 3D1.1(b), Count 6 is excluded from grouping because the statute specifies a term of imprisonment to be imposed and requires that such term of imprisonment run consecutively to any other term of imprisonment."

According to the PSR, the adjusted offense level for Group 1 was 34, *id.* ¶ 33, and the adjusted offense level with respect to Group 2 was 32. *Id.* ¶ 43. Pursuant to U.S.S.G. § 3D1.4, the PSR assessed a two-level upward adjustment to the greater of the adjusted offense levels, *i.e*, the offense level with respect to Group 1. *Id.* ¶¶ 44–47. This resulted in a combined adjusted offense level of 36. *Id.* ¶ 47. After a three-point deduction for acceptance of responsibility under U.S.S.G. § 3E1.1, defendant had a final offense level of 33 as to Counts One and Four. *Id.* ¶ 51.

The PSR indicated that defendant had a limited criminal history. *See id.* ¶¶ 54–55. In particular, according to the PSR, on September 1, 2006, defendant pleaded guilty to the operation

of a taxi without a license.  *Id.* ¶ 54. The PSR did not impose any criminal history points with respect to this conviction.  *See id.*  The PSR also indicated that on July 24, 2006, defendant received probation before judgment in the District Court for Baltimore City, in relation to a charge of possession of a controlled dangerous substance.  *Id.* ¶ 55.  Defendant received one criminal history point for that offense.  *See id.*   Defendant had a criminal history score of one,  *id.* ¶ 59, and a criminal history category of one.  *Id.* ¶ 60.

For Counts One and Four, based upon a total offense level of 33 and a criminal history category of I, defendant's advisory sentencing Guidelines called for a period of imprisonment ranging from 135 to 168 months of incarceration.  *Id.* ¶ 89.  Accounting for the required minimum consecutive sentence of seven years, or 84 months, with respect to Count Six, defendant's Guidelines were, in effect, 219 to 252 months of incarceration.

Sentencing was held on May 13, 2016, before Judge J. Frederick Motz.  *See* ECF 217. [3] With respect to Counts One and Four, Judge Motz imposed concurrent sentences of 84 months of incarceration.  ECF 232 ("Judgment") at 2.  With respect to Count Six, Judge Motz sentenced defendant to a term of 84 months of incarceration, consecutive to the sentences imposed with respect to Counts One and Four.  *Id.*  Therefore, defendant was sentenced to a total term of incarceration of 168 months, "with credit for time served . . . since May 25, 2015."  *Id.*

On May 3, 2017, defendant filed, through counsel, a "Motion to Vacate Conviction Under 28 U.S.C. § 2255."  ECF 247 ("Motion to Vacate").  In the Motion to Vacate, defendant asserted, *id.* at 1, that his conviction for use of a firearm during a crime of violence in violation of 18 U.S.C.

---

[3] This multi-defendant case was originally assigned to Judge Motz.  *See* Docket.  Due to the retirement of Judge Motz, the case was reassigned to me in October of 2017, prior to the disposition of the entire case.  *See id.*

§ 924(c)(1)(A) (Count Six), "must be vacated in light of the Supreme Court's . . . decision in" *Johnson v. United States*, 576 U.S. 591 (2015).  On June 6, 2017, the government moved to stay proceedings with respect to defendant's Motion to Vacate, pending the Fourth Circuit's anticipated ruling on "whether kidnapping qualifies as a crime of violence."  ECF 252 ("Motion to Stay") at 2.  The Court granted the Motion to Stay.  ECF 255.  The parties later agreed to the extend the stay until the Supreme Court issued a decision in *United States v. Davis*, 588 U.S. 445 (2019).  ECF 312 at 2.  The Court decided *Davis* on June 24, 2019.

On August 6, 2019, defendant filed, through counsel, an "Emergency Supplemental Motion to Vacate Conviction under 28 U.S.C. § 2255."  ECF 315-1 ("Supplemental Motion to Vacate").  The government responded to the Supplemental Motion to Vacate on September 6, 2019.  ECF 322 ("Response").  In the Response, the government "concede[d] that," in light of *Davis*, 588 U.S. 445, "both Hobbs Act conspiracy [Count One] and kidnapping [Count Four] no longer qualify as valid predicate 'crime[s] of violence' under 18 U.S.C. § 924(c)."  ECF 322 at 1 (first alteration added).  Therefore, the government agreed that defendant "is entitled to vacatur of his conviction for using . . . a firearm during . . . a crime of violence (Count Six) . . . ."  *Id.*  at 3.

On October 31, 2019, the Court granted the Motion to Vacate and ordered the vacatur of defendant's judgment of conviction with respect to Count Six.  ECF 338, ¶¶ 3, 4.  Resentencing as to Counts One and Four was scheduled for January 27, 2020.  *Id.* ¶ 5.  However, it was later rescheduled to September 14, 2020.  ECF 413.

An Amended Presentence Report was prepared.  ECF 366 ("Amended PSR").  Pursuant to U.S.S.G. § 3D1.2(b) and (c), the Amended PSR grouped defendant's convictions with respect to Count One and Count Four.  *Id.* ¶ 26.  And, the PSR noted:

> The plea agreement contains a stipulation wherein the defendant admits committing additional robberies. Therefore, pursuant to [U.S.S.G. §] 1B1.2(c), a conviction by

a plea of guilty containing a stipulation that specifically establishes the commission of additional offenses, shall be treated as if the defendant had been convicted of the additional counts charging those offenses.

Pursuant to U.S.S.G. § 1B1.2(c), the Amended PSR treated the "Robbery on July 22, 2012" as an additional conviction. *See* ECF 366, ¶¶ 38–46. This robbery was the sole offense assigned to Group 2. *See id.*

The Amended PSR determined that the adjusted offense level with respect to Group 1 was 37. *Id.* ¶ 37. And, the Amended PSR determined that the adjusted offense level with respect to Group 2 was 31. *Id.* ¶ 46. Pursuant to U.S.S.G. § 3D1.4, the Amended PSR assessed a one-level adjustment to the greater of the adjusted offense levels, i.e, the offense level with respect to Group 1. *Id.* ¶¶ 47, 49–50. Therefore, defendant's combined adjusted offense level was 38. *Id.* ¶ 50. After a three-point deduction for acceptance of responsibility, defendant's total offense level was 35. *Id.* ¶¶ 52–54. As noted, defendant had a criminal history category of I. *Id.* ¶ 60. Based upon a total offense level of 35 and a criminal history category of I, defendant's Guidelines called for a period of imprisonment ranging from 168 months to 210 months. *Id.* ¶ 91.

Resentencing was held on September 14, 2020. ECF 420. During the resentencing hearing, I stated, with respect to defendant's offenses, ECF 571 at 3: "There are a number of characterizations that . . . come to mind: Egregious, horrifying, heinous, despicable, shocking, base, depraved." Nonetheless, I also recognized that defendant's expected deportation to Belarus, "an unknown land, where he knows no one," would be "an incalculable hardship." *Id.* at 10.

The government opposed a reduction of sentence. ECF 357. Nevertheless, I reduced defendant's sentence from 168 months to 160 months of imprisonment, with credit for time served since May 20, 2015. ECF 416 at 2. Specifically, I sentenced defendant to concurrent terms of 160 months of incarceration with respect to Count One and Count Four. *Id.*

Defendant filed the instant Motion on December 12, 2022.  ECF 557.  The Office of the Federal Public Defender has declined to represent him in connection with the Motion.  ECF 563.

Sosonko, who was born in November 1980, is now 43 years old.  *See* ECF 351 at 2.  He is incarcerated at the Federal Correctional Institution in Loretto, Pennsylvania ('FCI Loretto').  *See Find an inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed July 1, 2024).  With credit for time served from May 20, 2015, he has served about 110 months, or 68 percent, of his 160-month sentence.  He has a projected release date of September 29, 2026.  *Find an inmate*, *supra*, https://www.bop.gov/inmateloc/.

## II.    COVID-19

### A.

Health officials confirmed the first case of COVID-19 in the United States on January 31, 2020.[4]  *United States v. Pair*, 84 F. 4th 577, 580 (4th Cir. 2023) (citation omitted).[5]  Then, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19)*, TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

The pandemic spawned "a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md.

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://perma.cc/24J3-UQZN.

2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam). Indeed, for a significant period, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, 462 F. Supp. 3d 746, 752–53 (E.D. Mich. 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). Schools and businesses were closed, or operated on a limited basis, in an effort to thwart the spread of the virus, which is extremely contagious. *Pair*, 84 F.4th at 589; *see Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (August 11, 2022), https://perma.cc/QGL2-3URS. As the Fourth Circuit has put it, in the early months of 2020, "a new reality set in. Nations around the world announced stringent limitations on in-person interaction . . . businesses ground to a halt; and death tolls mounted." *Pair*, 84 F.4th at 580.

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.* Nevertheless, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020), *abrogation on other grounds recognized by United States v. Phillibert*, 557 F. Supp. 3d 456 (S.D.N.Y. 2021) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

People infected with the coronavirus sometimes experience only mild or moderate symptoms. But, particularly at the outset of the pandemic, the virus caused severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield*

*KOA*, 461 F. Supp. 3d at 223 (citation omitted).  On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden Marks One Million U.S. COVID Deaths After Losing Political Battles*, Reuters (May 12, 2022), https://perma.cc/TLA5-YNFB.  And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://perma.cc/J7XS-FYHT.

The Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and has repeatedly revised its guidance concerning medical conditions that pose a greater risk of severe illness due to COVID-19.  The CDC most recently updated its guidance in May 2023 to reflect the most current data. *See People with Certain Medical Conditions*, Ctrs. for Disease Control & Prevention (May 11, 2023), https://perma.cc/923J-T5P8.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities such as Down syndrome; heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; having a BMI 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://perma.cc/VG23-TQMM. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person."  *People with Certain Medical Conditions*, *supra*, https://perma.cc/923J-T5P8.

### B.

As noted, the coronavirus is "highly contagious."  *Pair*, 84 F.4th at 589.  At the outset of the pandemic, some of the "measures we now know to be useful in combating the spread of the virus (such as masking, separation . . . and vaccinations) were either nascent or, as in the case of vaccines, unavailable."  *Id.*  Nevertheless, in an effort to prevent the spread of COVID-19, the CDC urged, *inter alia*, the practice of "social distancing."  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://perma.cc/UJ98-2V6S; *see also Pair*, 84 F.4th at 585.

However, social distancing and "rigorous personal hygiene," which are "important combatants to the virus," are particularly difficult in the penal setting.  *Seth*, 461 F. Supp. 3d at 248.  Indeed, prisoners have little ability to protect themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and*

*Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020), https://perma.cc/3RHL-WNKU.  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We Do Not Feel Safe,'* WASH. POST (Aug. 24, 2020), https://perma.cc/K6SW-LFGX (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep.  Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to limit their spread.  *See Coreas v. Bounds*, TDC-20-0780, 451 F. Supp. 3d 407, 413 (D. Md. 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021), https://perma.cc/TR7Q-8H9J ("The cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease.  Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519–20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, "in recognition of [the] stark reality" that COVID-19 posed substantial challenges to incarcerated individuals, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 461 F. Supp. 3d at 248. In particular, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."

Thereafter, on March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP should prioritize

for review for home confinement eligibility those inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

There is no cure for the coronavirus.  But, medical therapies have continued to improve, and vaccines are now generally available.  *See Stay Up to Date with COVID-19 Vaccines*, CENTERS FOR DISEASE CONTROL & PREVENTION (Oct. 4, 2023), https://perma.cc/VZ77-KN7W.  Although the vaccines do not appear to prevent illness, they do seem to reduce the seriousness of an illness.

On January 4, 2021, at about the time the first vaccines became available, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://perma.cc/P4KL-PEZW.  It provided that administration of the COVID-19 vaccines (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://perma.cc/2FF2-G6PX.

Much has changed since the coronavirus first emerged in early 2020.  And, the virus, too, has changed repeatedly, with multiple strains and variants.  As of May 11, 2023—the last day on which the CDC updated its vaccine tracker—approximately 69% of the total U.S. population had completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up.  *See COVID-19 Vaccinations in the United States*,

CTRS. FOR DISEASE CONTROL, https://perma.cc/B2KG-M4E3 (final update May 11, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, CTRS. FOR DISEASE CONTROL, https://perma.cc/6W5Q-55DR (final update May 11, 2023).

**D.**

In an interview in September 2022 on the CBS television show "60 Minutes," President Biden declared that the pandemic was "over" in the United States.  Alexander Tin, *Biden Says Covid-19 Pandemic is "Over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over."  *Id*.  And, on April 10, 2023, President Biden signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic." Pub. L. No. 118-3, 137 Stat. 6 (2023).

Nevertheless, even as of the time of this writing, data suggests that COVID-19 remains prevalent.  *See COVID Data Tracker*, CNTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated July 15, 2024). Available data may not provide a full picture of COVID-19's spread because, "[s]ince the end of the public health emergency on May 11, 2023, data that has been crucial to understanding the spread and impact of Covid is reported by government sources less frequently, or is no longer reported at all."  *Track Covid-19 in the U.S.*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2023/us/covid-cases.html (last updated March 26, 2024). But, a new "summer covid wave" has emerged, causing "[c]oronavirus activity in wastewater [to] reach[] levels considered 'high' or 'very high' in 26 states."  Fenit Nirappil & Lizette Ortega*, Covid Summer Wave Spreads Across U.S., Even Infecting Biden*, Wash. Post (July 18, 2024), https://perma.cc/JC8B-29AR.

### III.    Legal Standard

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Davis*, 99 F.4th 647, 653 (4th Cir. Apr. 18, 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).   But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly *permitted* by statute."  *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

One statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  *Hargrove*, 30 F.4th at 194.

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion by the Director of the Bureau of Prisons ("BOP").  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because

§ 3582 "vests absolute discretion" in the BOP).

For many years, the BOP rarely filed such a motion on an inmate's behalf.  As a result, compassionate release was an infrequent occurrence.  *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

However, with the passage of the First Step Act ("FSA") in 2018, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582, by enabling a federal inmate to file a motion for compassionate release directly with the court, as long as the inmate first exhausted administrative remedies.  *See Malone*, 57 F.4th at 173; *United States v. McCoy*, 981 F.3d 271, 275–76 (4th Cir. 2020).  In particular, the FSA authorized a court to grant compassionate release "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.

However, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831.  These criteria have been described as "two steps."  *See*, *e.g.*, *Bond*, 56 F.4th at 383.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831

20

(citation omitted); *see Davis*, 99 F.4th at 654; *Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 383 (2021).  If that criterion is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

As the Fourth Circuit has recognized, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 654.

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement").   "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners.  *Davis*, 99 F.4th at 654; *see McCoy*, 781 F.3d at 281.  The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. 1B1.13 (2021) (emphasis added).  Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 281, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  Therefore, on the basis of that earlier text, the Court held:  "When a defendant exercises his . . . right to move for compassionate release on his own behalf, § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts."  As a result, district courts were "empowered . . . to consider any

extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted).

However, effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is now applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction"). As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A).

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

(B) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

  (1) (A) extraordinary and compelling reasons warrant the reduction; or

  (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

  (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

  (3) the reduction is consistent with this policy statement.

The Policy Statement identifies six circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *Id.* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as terminal illness, "serious cognitive impairment," the inability to receive specialized medical care while incarcerated, or the housing of the defendant at a correctional facility affected or at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public heath emergency . . . .", *id.* § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, *id.* § 1B1.13(b)(2); the defendant's family circumstances, *id.* § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction, of a correctional officer, *id.* § 1B1.13(b)(4)(A), (B); for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed . . . .", § 1B1.13(b)(6); and "any other circumstances or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." *Id.* § 1B1.13(b)(5).

Section 1B1.13(c) of the Policy Statement is titled "Limitation on Changes in Law." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c). "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment

to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 99 F.4th at 654.[6]

Section 1B1.13(d) of the Policy Statement, which concerns rehabilitation, limits the weight a court may assign to a defendant's rehabilitation while serving a sentence. It provides that, "[p]ursuant to 28 U.S.C. §994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d). "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.*

Even if a defendant establishes that extraordinary and compelling reasons warrant relief, the court must also consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826–27 (2010); *Brown*, 78 F.4th at 128; *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per

---

[6] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500. However, the Court acknowledged that "Congress or the Constitution [may] limit[] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence . . . ." *Id.* at 486. "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495. It follows that, because the Policy Statement is now applicable to prisoner-filed motions for compassionate release, a court may consider intervening changes of law only in the manner that the Policy Statement prescribes.

curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d at 693–94 (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion).   Notably, the recent amendments to the Guidelines did not alter this requirement.

The § 3553(a) "factors include . . . 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' and the 'need for the sentence imposed . . . to 'provide just punishment . . . afford adequate deterrence to criminal conduct . . . protect the public from further crimes of the defendant . . . and . . . provide the defendant with . . . training, medical care, or other correctional treatment.'"   *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024) (quoting 18 U.S.C. § 3553(a)).   As the Fourth Circuit has observed, "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'"   *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 at 500).   The district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor."   *Davis*, 99 F.4th at 656; *see United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021).   And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.   *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said:   "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a §

3553(a) analysis." But, the Court cautioned that "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018).

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*). In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190). And, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant actually received and the sentence he would receive, if sentenced under current law. *See Davis*,

99 F.4th at 661; *see* 18 U.S.C. 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."). In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . ." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

*Davis*, 99 F.4th at 647, is illustrative. The *Davis* Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6). *Id.* at 661. And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661. According to the Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.* The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)). The Court concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial." *Davis*, 99 F.4th at 661 (*citing Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)).

## IV.    Discussion

### A.

The government contends that defendant has not exhausted administrative remedies with respect to his request for compassionate release. ECF 574 at 13. I disagree.

As an exhibit to the Motion, defendant submitted an "Inmate Request for Compassionate Release Consideration Form," dated August 16, 2022. *See* ECF 557-18 ("Request of August 16,

2022"). In addition, as an exhibit to the Reply, defendant submitted a second "Inmate Request for Compassionate Release Consideration Form," dated July 18, 2022. ECF 588-2 at 3 ("Request of July 18, 2022"). Defendant also attached to the Reply (ECF 588) a letter to defendant from "M. Underwood, Warden," dated August 21, 2022. ECF 588-2 at 4 ("Warden's Response"). The Warden's Response provides, in part, *id.*: "[Y]our request for Compassionate Release/Reduction in Sentence is denied."

Based on the Request of July 18, 2022 (ECF 588-2 at 3), and the Request of August 16, 2022 (ECF 557-18), as well as the Warden's Response (ECF 588-2 at 4), I am satisfied that defendant has exhausted administrative remedies with respect to his request for compassionate release. Therefore, I turn to the merits of the Motion.

**B.**

Defendant identifies five purported grounds for compassionate release. I readily conclude that none provides a basis for compassionate release.

First, defendant claims that compassionate release is warranted because the prison conditions to which he is subject violate the Eighth Amendment. ECF 557 at 8–9; 19–20. According to defendant, the BOP "provid[es] him with inadequate care with respect to diet, medical treatment, clothing, rehabilitation, and living conditions . . . ." *Id.* at 8. In particular, defendant states that "[i]nmates live in an environment where drug use and access to drugs is off the charts, violence and brutality are around every corner, and intercourse between males—both consensual and nonconsensual—is nothing short of rampant." *Id.* at 9. And, defendant claims that the Medical Director at FCI Loretto is a "pediatric infectious disease specialist," *id.* at 19, who "is not trained to treat adult patients." *Id.* at 20. According to defendant, "[t]he doctors and clinicians

28

of the BOP have failed to meet the standard of care for disease prevention and treatment." *Id.* at 34.

The allegedly unconstitutional conditions of confinement to which defendant claims he is subject, *see* ECF 557 at 8–9, 19–20, do not provide a basis for relief under the Policy Statement.[7] *See United States v. Young*, MFU-16-10, 2023 WL 8722060, at *4 (W.D. Va. Dec. 18, 2023) (stating that "the revised guidelines do not contemplate that prison conditions can be a ground for a sentence reduction.[]"). To be sure, defendant may be able to seek redress for the alleged violations of his Eighth Amendment rights. But, in general, a federal prisoner's means of redress for a constitutional violation committed by a federal officer is by way of a lawsuit pursuant to *Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau*, 403 U.S. 388 (1971).[8]

---

[7] Under § 1B1.13(b)(4) of the Policy Statement, sexual assault of a prisoner by or at the direction of a correctional officer may provide an extraordinary and compelling reason for compassionate release. Although defendant refers to "rampant" and "nonconsensual" "intercourse between males," he does not assert that he has been the victim of sexual assault by or at the direction of a correctional officer. *See* ECF 557 at 9.

[8] As the Fourth Circuit recently recognized, "'[42 U.S.C.] § 1983 gives plaintiffs the statutory authority to sue *state* officials for money damages for constitutional violations . . . .'" *Fields v. Fed. Bureau of Prisons*, ___ F.4th ___, 2024 WL 3529034, at *2 (July 25, 2024) (citation omitted) (emphasis in *Fields*). But, "'there is no statutory counterpart to sue federal officials.'" *Id.* Therefore, if "they are to proceed at all, plaintiffs suing federal federal-officer defendants must proceed under an implied cause of action first established . . . in *Bivens* . . . ." *Id.*

In *Bivens*, 403 U.S. at 389, the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages . . . ." The Court has also recognized a *Bivens*-type damages remedy for violations of the Fifth Amendment's Due Process Clause, *see Davis v. Passman*, 442 U.S. 228, 236 (1979), and a prisoner's right under the Eighth Amendment to receive adequate medical care. *See Carlson v. Green*, 446 U.S. 14 (1980). The Court has declined to recognize a damages remedy in other contexts. *See Fields*, 2024 WL 3529034, at *3–4 (citing and discussing cases). Nevertheless, *injunctive* relief against a federal official who is violating the Constitution may be available even when a *Bivens*-type monetary remedy is not. *See Bivens*, 403 U.S. at 400 (Harlan, J., concurring) (acknowledging "presumed availability of federal equitable relief against threatened invasions of constitutional interests," given the "inherent equitable powers" of a federal district court) (citation and internal quotation marks omitted).

Second, defendant suggests that the COVID-19 "pandemic, combined with the prison's difficulties in responding to it, . . . constitute an extraordinary and compelling reason" for compassionate relief. *Id.* at 14; *see id.* 10–14. However, the general hardship caused by the COVID-19 pandemic does not constitute an extraordinary and compelling reason for relief.

Under § 1B1.13(b)(1)(D) of the Policy Statement, public health circumstances may provide a basis for relief only if:

> (D) The defendant presents the following circumstances—
>
>> (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;
>>
>> (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i);
>>
>> and (iii) such risk cannot be adequately mitigated in a timely manner.

Defendant has not provided any basis on which to conclude that FCI Loretto, the facility where he is currently housed, is "affected or at imminent risk of being affected by . . . an ongoing outbreak of infectious disease." U.S.S.G. § 1B1.13(b)(1)(D)(i). In fact, as of July 25, 2024, there were only three "open cases" of COVID-19 at FCI Loretto, which has an inmate population of more than 800. *See Inmate COVID-19 Data,* FEDERAL BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp#lastestCovidData (last updated July 25, 2024). Nor is FCI Loretto "affected by . . . an ongoing public health emergency declared by the appropriate federal, state, or local authority." U.S.S.G. § 1B1.13(b)(1)(D)(i). The public health emergency declared in response to the COVID-19 pandemic expired on May 11, 2023. *See Fact Sheet: End of the COVID-19 Public Health Emergency*, U.S. DEP'T OF HEALTH

AND HUMAN SERVICES, https://perma.cc/WQ6C-R7CM (May 9, 2023).  And, even if FCI Loretto were affected by an ongoing outbreak of infectious disease, defendant has not established that his health conditions place him "at increased risk of suffering severe medical complications or death," U.S.S.G. § 1B1.13(b)(1)(D)(ii), or that "such risk cannot be adequately mitigated in a timely manner."  U.S.S.G. § 1B1.13(b)(1)(D)(iii).

Third, defendant argues that he has various medical conditions that together provide an extraordinary and compelling reason for compassionate release.  *Id.* at 32–34.  In particular, defendant asserts that he has high cholesterol; high blood pressure; "<u>untreated</u> long COVID" following an infection in January 2022; and "chronic [and] aggressive periodontal disease."  *Id.* at 33 (emphasis in ECF 557).  Defendant also asserts that an electrocardiogram taken in 2018 "suggested ischemic heart disease."  *Id.* at 34.[9]

A review of defendant's medical records indicates that his medical conditions do not provide a basis for relief under the Policy Statement.  The records show that prison health care providers have treated his hypertension by prescribing daily use of lisinopril.  ECF 574-11 at 8; *see also* ECF 557-7 at 27 ("Pt states that he has been doing well. Pt denies chest pain, shortness of breath, fever/chills, abdominal pain, headache, dizziness or vision changes."); *id.* at 19 ("Pt states that he has been exercising and has lost a few pounds.  Currently feels fine.").  The records also indicate that prison health care providers have treated his high cholesterol by prescribing daily use of atorvastatin.  *See, e.g., id.* at 22.  And, the records indicate that defendant's "periodontal disease" consists of "[m]ild generalized inflammation."  ECF 557-8 at 9.  Finally, although an

---

[9] The electrocardiogram submitted to the Court was taken in September of 2016.  *See* ECF 557-7 at 5.

electrocardiogram taken in 2016 was "[a]bnormal," *id.* at 5, the records otherwise provide no evidence that defendant is affected by a heart condition.

Therefore, the medical records available to the Court provide no basis on which to conclude that defendant is "suffering a terminal illness," U.S.S.G. § 1B1.13(b)(1)(A); "suffering from a serious physical or medical condition . . . that substantially diminishes [his] ability to provide self-care," *id.* § 1B1.13(b)(1)(B); or "suffering from a medical condition that requires long-term or specialized medical care that is not being provided . . . ." *Id.* § 1B1.13(b)(1)(C).

Defendant's fourth argument is that compassionate release is warranted because "[w]hat [he] has been and continues to be subjected to is inherently <u>unfair</u> . . . ." ECF 557 at 36. In support of his contention that "unfairness" provides an extraordinary and compelling reason for compassionate release, defendant cites *Setser v. United States*, 566 U.S. 231 (2012). ECF 557 at 36. In *Setser*, 566 U.S. at 242–43, the Supreme Court stated that 18 U.S.C. § 3582(c)(1)(A) "provides a mechanism for relief" when a "district court's failure to anticipate developments that take place after the first sentencing produces unfairness to the defendant." (Cleaned up).

As an initial matter, defendant's claim of "unfairness" is generally stated and unsupported by any detail. He simply asserts: "The defendant believes that the things he's been subjected to are unfair . . . ." ECF 557 at 36.

The compassionate release statute mandates that any reduction in sentence be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The applicable Policy Statement makes no provision for relief with respect to a general claim of "unfairness." Therefore, defendant's assertion of "unfairness" does not provide a basis for compassionate release.

*Setser*, which was decided in 2012, is not to the contrary.  There, the Court held that a federal court imposing a sentence has the authority to order that the federal sentence be consecutive to a state sentence yet to be imposed.  *Setser*, 566 U.S. at 244–45.  The defendant had argued that allowing "a district court to make the concurrent-vs.-consecutive decision when it does not have before it all of the information about the anticipated state sentence," *id.* at 241, could "produce[] unfairness to the defendant." *Id.* at 243.  In response to the defendant's concern about unfairness resulting from the imposition of an unanticipated state sentence, the Court quoted the compassionate release statute, without explanation.  *See id.*  But, the Court did not hold that generally alleged "unfairness" provides an extraordinary and compelling reason for relief.

Finally, in the Supplement and the Reply, defendant asserts a ground for relief not identified in the Motion.  *See* ECF 576; ECF 588 at  In particular, defendant asserts that the federal kidnapping statute, 18 U.S.C. § 1201, requires that "the perpetrators of the act must transport the victim across State lines."  ECF 588 at 2.  According to Sosonko, his conviction of kidnapping is void because "[t]hat requirement is not met in this case." *Id.* at 2.

A petition for post-conviction relief under 28 U.S.C. § 2255 "is the exclusive method of collaterally attacking a federal conviction or sentence . . . ." *Ferguson*, 55 F.4th at 270.  Therefore, "a criminal defendant is foreclosed from the use of another mechanism, such as compassionate release, to sidestep § 2255's requirements." *Id.*  Defendant's claim that his kidnapping conviction is void is not properly raised in a motion for compassionate release.

In any event, it is not the case that the federal kidnapping statute, 18 U.S.C. § 1201, requires that "the perpetrators of the act . . . transport the victim across State lines."  ECF 588 at 2.  The statute provides, in relevant part, 18 U.S.C. § 1201 (emphasis added):

 (a) Whoever unlawfully . . . kidnaps . . . any person  . . .when—

> (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce *or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense* . . .

shall be punished by imprisonment for any term of years or for life and, if the death of any person results, shall be punished by death or life imprisonment.

In other words, the conditions for liability set forth at 18 U.S.C. § 1201(a)(1) are disjunctive: a defendant is liable if he transports the victim across state lines *or* if the defendant uses an instrumentality of interstate commerce.  In *United States v. Small*, 988 F.3d 241 (6th Cir. 2021), the Sixth Circuit explained, *id.* at 251:

> In 2006, Congress amended the Federal Kidnapping Act.  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109–248, 120 Stat. 616 (codified at 18 U.S.C. § 1201(a)(1)).  Previously, the statute only applied when the kidnapped person was transported in interstate commerce.  Now, it applies when "the *offender* travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1) (emphasis added).  Thus, the additional language expanded federal jurisdiction to reach kidnappings in which the defendant crosses state lines or channels or facilities of interstate commerce were used to commit the crime, even when the physical kidnapping occurred within the borders of a single state.  *See id*.

The facts to which defendant stipulated in the Plea Agreement readily satisfy the requirement that "the offender . . . use[] the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1).  In particular, in the Plea Agreement, defendant agreed to the following facts, ECF 154 at 13:

> Throughout the incident, the conspirators, including Sosonko, communicated with each other in furtherance of the offenses using mobile phones. The mobile phones and the GPS device are instrumentalities of interstate or foreign commerce.

In sum, defendant has not identified an extraordinary and compelling reason for relief.  For that reason, I need not consider whether compassionate release would be consistent with the sentencing factors enumerated at 18 U.S.C. § 3553(a).

### V.    Conclusion

For the foregoing reasons, I shall deny the Motion (ECF 557).  An Order follows, consistent with this Memorandum Opinion.


Date:   August 1, 2024                                    _____/s/_____

Ellen Lipton Hollander
United States District Judge